IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:14cv170

| | |
|---|---|
| STANLEY JEFFREY PENLEY,<br><br>        Plaintiff,<br><br>v.<br><br>McDOWELL COUNTY BOARD OF EDUCATION; GERRI MARTIN; NATALIE GOUGE; H. RUSSELL NEIGHBORS; and ROBERT "MITCH" GILLESPIE,<br><br>        Defendants. | **PLAINTIFF'S REPLY TO DEFENDANTS' RESPONSE TO MOTION TO COMPEL**<br>**(BOE, Neighbors, Gouge)** |

    **Now Comes Plaintiff**, by his undersigned counsel, responding to Defendants' Response (#59) to Plaintiff's Motion to Compel (#58).

**1. Plaintiff has complied with Rule 37's "certification" requirements.**

    Plaintiff's Motion to Compel states as follows:

> 14. As reflected in the Timeline attached hereto as **Exhibit H,** the undersigned counsel have made repeated efforts to resolve these issues informally with defense counsel pursuant to LCvR 7.I(B), by way of undersigned's letter of August 4th to defense counsel; defense counsel's responsive letter of August 10th; and undersigned's letter to defense counsel of August 17th. And although Plaintiff's counsel attempted to explore further resolution by phone on August 24th, Defense counsel conveyed to Plaintiff that the Defendants were standing by their existing responses and objections and invited Plaintiff's counsel to "tee up" the instant motion, thereby necessitating the same.

*Plaintiff's Motion to Compel*, ¶ 14. But in making this preposterous argument, Defendants not only utterly ignore paragraph 14 of the Motion, but also the exhaustive timeline set out in *Exhibit H* that details the chronology of his numerous efforts to resolve this dispute prior to seeking the Court's assistance. Nor do Defendants gain any traction with the three unpublished district court opinions they rely upon, all of which involve *pro se* plaintiffs whose motions to compel uniformly omitted any certification at all.

This baseless argument on Defendants' part typifies Defendants' deplorable conduct in this case and ought not be overlooked as an additional basis upon which this Court should sanction Defendants and/or Defendants' counsel under Rules 26(g), 37 and/or 11.

2. **The scope of Plaintiff's Motion is clear.**

In their next attempt to draw the Court's attention away from their profound discovery failings by "throwing something at the wall to see if it sticks,"[1] Defendants purport to be uncertain as to the "scope" of Plaintiff's Motion and otherwise cite largely inapposite law. Although additional proofreading of the *Motion* and supporting brief would doubtlessly have improved them both, the table set forth in Plaintiff's brief at pages 6 through 8 precisely identifies the subject requests, Defendants' objections, and the relevancy of those requests.

And although it is true that no further mention is made of the Neighbors and Gouge requests, it is because those requests and interrogatories involve the same subject matter as the requests set out in the table. Accordingly, resolution of the discovery dispute on the matters set forth in the table inherently resolves the disputes as to the parallel requests to Gouge and Neighbors.

3. **Defendants have failed to comply with the rules in multiple ways.**

As Plaintiff has addressed the Defendants' numerous failings in complying with Rule 34 in his principal brief, he will not reiterate those failings here. But Defendants' arguments are nonetheless remarkable for the following reasons: one, they admit that the production is *still* not complete and that they do not "anticipate" completing the first production before November 1, 2015. *Response,* pgs. 9 and 10  In other words, Defendants blithely admit that they will fully respond to Plaintiff's *first* set of discovery requests just two months before the close of discovery under the current case management plan.

---

[1] In addition to Defendants' baseless argument regarding "good faith" certification and the "scope" of Plaintiff's *Motion*, still another example of Defendants' desire to obscure the actual discovery issues raised by Plaintiff's *Motion* is the wholly gratuitous argument regarding production of Plaintiff's medical records (addressed below).

Second, while silent on the matter of their failing to produce even a single document when their agreed-upon extended deadline arrived, or requesting a further extension, they are actually attempting to place an affirmative obligation upon the plaintiff to demonstrate how their novel theory of a "rolling production" prejudices the Plaintiff where no such "burden of proof" exists.

Third, Defendants readily admit that they have not produced a privilege log but apparently intend to do so at some remote point in time once they've identified the underlying privileged documents.

Finally, and most incredulously, Defendants suggest that Plaintiff can show no prejudice if only because he has not noticed any depositions in the matter, the thought apparently never occurring to Defendants that Plaintiff – not unlike virtually all litigants from the dawn of time – prefers to notice depositions once he has in hand the responses to his discovery requests.

<u>"Document Dump"</u>

Elsewhere in Section III(a) of Defendants' *Response* is their continuing contention that they have produced documents as they are kept in their ordinary course of business, organized first by custodian and then chronologically. *Response*, pgs. 10-11. These assertions, which are the crux of Defendants' entire defense to the charge of "document dumping," are simply not true.

The undersigned have performed an actual, "eyes on" physical examination of each page of Defendants' 5747-page initial production. Undersigned has also used special software to search randomly the metadata of representative documents in said production.[2] Not only is the production not organized chronologically within sets of each of the sixteen custodians identified by Defendants, the identity of the "custodian" of each document

---

[2] It goes without saying that Defendants' initial production is not tailored to Plaintiff's Requests. Indeed, the production does not even identify which of the three distinct Defendants are producing which documents. This is extremely problematic since the "custodians" of each document produced cannot be identified.

Page **3** of **16**

Case 1:14-cv-00170-MOC-DLH   Document 64   Filed 09/28/15   Page 3 of 16

cannot be discerned either from the "face of the document" or the metadata. There are literally *hundreds of* potentially different "custodians" of Defendants' documents according to Defendants' definition of how they "organized" their production!

An analysis of the following email document sequence, BOE 2342-2357, is instructive:

- 2342    4/4/12       McKinney to Staff
- 2343    11/7/11*     Hall to Talbert
- 2345    4/4/12       Brooks to McKinney
- 2347    8/30/11*     Inman to Tipton
- 2348    9/29/11      Furgeson to Tipton
- 2350    12/20/11     Penley to NCSU
- 2351    2/23/12      Brooks to Hils  (see 2054: same parties, same date)
- 2352    10/3/11*     McCayle to Tipton
- 2354    8/30/11*     Inman to Tipton  (see 2347: same parties and date)
- 2356    9/23/11      Penley to Talbert

(* denotes out of chronological order with previous document) *See Reply Exh. A*

First, just because the face of the document purports to reveal the sender and receiver of the email on the given date, it reveals nothing about who the document "custodian" may be.

Second, Plaintiff is unaware of any affirmative obligation that compels a *requesting* party to look to "metadata" to ascertain who the document's custodian is. Despite using a reputable eDiscovery search tool, moreover, the metadata did *not* actually reveal the document's custodian.

Significantly, none of the senders/recipients of these emails are among the sixteen "custodians" identified by Defendants. If, for example, Tipton is a "custodian" of both 2352 and 2354, why are they produced out of chronological order? It is actually impossible to discern if Tipton is indeed the custodian of those two documents -- McCayle and/or Inman are just as likely to be (or none of them, for that matter).

The foregoing sample run is by no means the only example -- there are multiple similar examples too numerous to include herein.

There are other anomalies which directly belie Defendants' assertion of "organization in chronological order within sets of custodians." *See, e.g., BOE* 1999 and 2185 (*Reply Exh.*

*B*). These documents carry the same date (June 11, 2012) and are to/from the same individuals (Foster and Hall, neither of whom have been identified as among the sixteen custodians), yet appear in the production almost 200 pages apart.

These recurring anomalies are exacerbated by the format of BOE production which obscures the actual dates of documents until opened, as each "native" document produced is initially identified by the date on which it was presumably formatted by BOE for production to Plaintiff (July 15, 2015). Indeed, Defendants' formatting-for-production process has, in and of itself, arguably destroyed their "as-stored-in-the-ordinary-course-of-business" status.

ESI search term list

In the face of multiple objections from Plaintiff as to the narrow scope of search terms Defendants used to search for ESI, Defendants contend that "Plaintiff apparently believes he has the right to require the Board to search all the documents using all of his proposed terms, no matter how tenuously connected to his suit . . . ." *Response*, p. 12. "Instead of searching through hundreds of thousands of documents using common terms," Defendants conclude, "the Responding Defendants focused on locating documents that actually related to Plaintiff and respond to his RFPs." *Id.*

First of all, Plaintiff believes no such thing about his search term list; that is why he facially characterized it as a "*proposed*" list. And although Plaintiff's counsel invited Defendants' counsel to try to reach agreement on the "actual" search term list, Defendants never even deigned to respond to the invitation.

Second, contrary to their contention that their terms were designed to respond to Plaintiff's requests, and taking just two examples, Defendants inexplicably declined to search on any of these terms -- "Jolene", "Hollowell", "Gabe", and "Robinson" – in spite of the fact that students Jolene Holowell and Gabe Robinson were the primary "accusers" of Plaintiff, and the false and unfounded basis Defendants relied upon as their pretext for seeking the Plaintiff's termination. Defendants' response to Request #19 again typifies

Defendants' cavalier attitude toward its discovery obligations: while Plaintiff asked for documents relating to Defendants' communications with Hollowell and Robinson, Defendants simply refused to look for communications involving either Hollowell or Robinson, apparently on the grounds that the request is "mere speculation." *Response*, p. 12.

<u>Minor Student's Health Condition</u>

Defendants candidly acknowledge that Jolene Hollowell initially reported that Plaintiff allegedly made an inappropriate remark in one of his classes, and that *she herself* made Plaintiff aware of a health condition that could bear on her credibility as a witness regarding the alleged events. In their next breath, Defendants accuse Plaintiff of "retaliating" against the student and attempting "to harass and embarrass a young woman who is not a party to this suit and whose medical conditions have no bearing on any alleged conspiracy against Plaintiff . . . ." It is an appalling accusation that ignores the reality that Plaintiff is seeking information regarding *Defendants'* knowledge (rather than Ms. Hollowell's) of Ms. Hollowell's health condition.

Too, this is anything but "fishing expedition" by which Defendants characterize it. Plaintiff had good reason for his document request (#20) as the administrative hearing officer himself, in rejecting each of Martin's charges against Plaintiff, found the student accuser to be "troubled" and her credibility to be "very questionable."

If in fact the Defendants were aware that Ms. Hollowell suffered from a mental health condition that would by its very nature call her credibility into question (the student was listed as "medically fragile" on the District's daily attendance record), that awareness would be highly relevant to whether or not the Superintendent's alleged basis for seeking Plaintiff's termination was in fact pretextual. This is especially so in light of Plaintiff's allegations that Defendant Martin adopted the student's charges *verbatim* as her (Martin's) own without investigating them as to their veracity, the latter in and of itself circumstantial evidence of pretext.

### 4. Plaintiff's Requests for information regarding possible "comparators" is "relevant" for discovery purposes.

As argued in Plaintiff's principal brief, evidence of similarly situated employees may be relevant at trial. Defendants, however, are attempting to usurp the role of the Court and Jury by unilaterally deciding whether the experience of other career employees renders them relevant "comparators" for purposes of *discovery*.

Notably, none of the cases Defendants cite in support of their opposition involve matters of *discovery*; rather, they are uniformly concerned with the relative merits of the concerned plaintiff's "comparator" evidence for purposes of summary judgment -- the standards regarding relevance for purposes of discovery are different. *See Barella v. Vill. of Freeport,* 296 F.R.D. 102, 106 (E.D.N.Y. 2013) and Plaintiff's principal brief (#58-9), pgs. 3 - 4.

Further, Defendants are trying to hoodwink the Court into thinking that, in order to *discover* certain evidence, there is an affirmative pleading requirement on the part of the plaintiff to set forth the mode of proof by which he intends to prove his case at trial, and that Plaintiff must allege disparate treatment or pretext before obtaining evidence relevant to either.  No such requirement as to the former exists in § 1983 jurisprudence and, with respect to the latter, Defendants' reliance on a district court opinion in New York – *Franzon v. Massena Mem'l Hosp.* -- is very scanty ground indeed upon which to make such a comprehensive assertion.

First of all, the *Franzon* court *reversed* the magistrate judge's decision to bar the Plaintiff's discovery requests of potential comparators, and ordered the Defendant therein to produce materials relating to colleagues of the Plaintiff.

> As with Title VII cases, the causal connection between the *First Amendment* speech and the alleged retaliatory conduct may be shown directly through evidence of retaliatory animus aimed at a plaintiff by the defendant, or indirectly through evidence such as disparate treatment of fellow employees who engaged in similar conduct. Because the Federal Rules of Civil Procedure permit discovery of information that reasonably will lead to the discovery of admissible evidence, plaintiffs are entitled to obtain discovery of that which would tend to support their claim of retaliation. This

may well include evidence demonstrating that he was treated differently than other employees because of his alleged protected speech."

*Franzon v. Massena Mem'l Hosp.*, 32 F. Supp.2d 528, 533 (N.D.N.Y. 1998).

In any event, and in an affront to the Court, Defendants state a bald-faced lie that "Plaintiff's Amended Complaint does not allege any type of disparate treatment or pretext." *Response*, p. 19. In truth, Plaintiff alleges both. *See* ¶¶ 39, 45, 47, 48, and 49 of the *First Amended Complaint.* For example, Paragraph 39 alleges that Defendant Martin, while seeking Plaintiff's termination for violating a non-existent "no-Face Book-with-student" policy, knew that "many other teachers in the District had active interaction with students on Face Book, none of whom were disciplined or admonished in any way." *That is an allegation of disparate treatment.* Paragraph 45 alleges that Defendant Martin's grounds for dismissal of Plaintiff "were a sham and a pretext by each Defendant to cover up Defendants' retaliatory motives."

Defendants also ignore the fact that the parties' respective positions were exhaustively laid out in their respective briefs relating to Defendants' *Motion to Dismiss*. In other words, contrary to the bill of goods Defendants are trying to sell, this case has been, from its inception, presented and argued (through extensive 12(b)(6) briefing) as a mixed motive, pretext-based 1st Amendment retaliation conspiracy.

The *Franzone* case does not, as Defendants seem to contend, stand as a "proof text" for the restrictive proposition that a Plaintiff must plead every scintilla of evidence in his case, or he cannot pursue discovery for evidence which has not been plead. Here, Plaintiff has adequately pled his Claim under the Rules governing the pleading of an action. Having done so, he is entitled to seek information which could reasonably lead to the discovery of admissible evidence tending to prove his claim.

In a mixed motive pretext case, there are many circumstantial indicators/evidence, not necessarily included in a complaint, from which a trier of fact may conclude that

Page **8** of **16**

Case 1:14-cv-00170-MOC-DLH   Document 64   Filed 09/28/15   Page 8 of 16

Defendants' proffered grounds for dismissal were pretextual. It is that evidence Plaintiff seeks by way of the specific requests addressed below and in Plaintiff's principal brief.

Defendants, in short, would do well to recall that federal courts rely on notice pleading rather than the hyper-detailed pleading standard they are trying to impose upon this Court for the sole purpose of evading their responsibilities under the discovery rules.

**5.    The discovery Plaintiff seeks regarding other employees (similarly situated or not) is relevant and calculated to lead to the discovery of admissible evidence.**

Defendants object to Plaintiff's efforts to obtain discovery regarding the following subjects:

### Andy and Vicki Webb

At pages 17 - 18 of their *Response*, Defendants misapprehend the context of why Plaintiff's RFPs – specifically, BOE 17, 21; Neighbors' 8, 9, and 10 -- are discoverable. The undersigned informed Defense counsel of the "threshold and apparent relevancy"[3] in undersigned's letter of August 17, 2015 to Mr. King (#59, Exh. C). The context is to demonstrate a "pattern or practice" by the very same actors – Defendants Gillespie, Neighbors, and Martin – in their treatment of the Webbs as in their treatment of Plaintiff. That is to say, the "comparators" are the actors, not the victims.

In 2012, when Vicki Webb was under the direct supervision of Martin, the very same actors may have conspired to adversely affect Ms. Webb's employment as a principal in the District, and to block the employment of Andy Webb by the District, in retaliation for Andy Webb's political activities. If responsive materials to the RFPs listed above substantiate this conspiracy, that would be evidence supporting Plaintiff's claim that the very same three actors conspired against him here, for the very same motive.

---

[3] Once Plaintiff shows "threshold and apparent relevancy", as he has for every RFP in dispute, the burden shifts back to the Defendants to show "lack of relevance by demonstrating that the requested discovery (1) does not come within the broad scope of relevance as defined under FRCP 26, or (2) is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption of broad discovery. *Desrosiers* v. *MAG*, 675 F. Supp. 2d 598, 601-602 (D. MD. 2009).

Defendant Martin has already produced texts (GM039, GM040, GM042, and GM043) between her and Defendant Neighbors that give some insight into the possible retaliation against the Webbs.[4] *Reply Exh. C.* Those texts recount exchanges wherein Neighbors is essentially spying on the Webbs' activities in the District, and reporting his findings to Martin. Why is the BOE President (Neighbors) "tattling" on the Webbs to the Superintendent (Martin)? The answer could be that Neighbors' surveillance of the Webbs was in furtherance of a conspiracy against the Webbs. And if they have engaged in a conspiracy once, they may well have engaged in a subsequent conspiracy against Plaintiff.

### Rodney Wheeler; "N-Word" racial Slur

Defendants object to Gouge RFP 7 on the basis of relevancy, again arguing that the subject is not a similarly situated "comparator." *Response*, p. 18. In fact the person inquired about, Rodney Wheeler, was an Assistant Principal under the direct supervision of Defendant Gouge. Contrary to the claims of Defendants, Wheeler was subject to the same BOE Policies governing the disciplining of personnel, and the same state statute governing the suspension and dismissal of certified career staff, N.C. Gen. Stat. § 115C-325. Neither the BOE Policies nor the statute make any distinction between the two positions. In fact, at the time, § 115C-325 (since repealed) lumped career administrators and career teachers together under the rubric of "career employees" – hence, the use of that definition in Plaintiff's requests.

Wheeler is known to have used a racial epithet against a Black student, arguably a much more serious charge than the Plaintiff's alleged "inappropriate sexual comment." Defendants Gouge and Martin's failure to investigate the students' complaints suggests that they were sweeping the matter under the rug; and, further, their violation of BOE policy in not investigating the matter may well be circumstantial evidence of why and how Martin's charges against Plaintiff for his alleged comments to students were pretextual.

---

[4] Martin's production begs the obvious question why Neighbors himself has yet to produce his records reflecting the same communications regarding the Webbs. They are possibly forthcoming in his subsequent "rolling production."

### Martin's Recruitment and Hiring

At pages 19 - 20 of their *Response*, Defendants seek to bolster their relevancy objections to BOE RFP 16 and Neighbors RFP 12. Plaintiff informed the Defendants of the "threshold and apparent relevance" of these requests in attorney Roth's letter to attorney King, dated August 4, 2015, wherein Roth stated that the circumstances underlying Defendant Martin's recruitment and hiring "is relevant to the extent it reveals her relationship with other defendants prior to her employment as well as "perks" she may have received in the negotiation process – such as nominal rent in her lodgings."

Plaintiff has alleged (¶¶ 26-32) that the relationships among Gillespie, Neighbors, and Martin were, in essence, reciprocal "back-scratching" relationships whereby those co-conspirators were "beholden" to each other. Plaintiff alleges that Neighbors was the "primary if not dominant" supporter of Martin's candidacy for Superintendent. Other BOE members' opinions and communications regarding her candidacy are relevant as they may highlight Neighbors' impact on Martin's ultimate hiring.

On the issue of Neighbors' involvement in the recruitment and hiring of Martin, Defendants state at the bottom of page 20 of their *Response* that, upon counsel's inquiry of Neighbors for response to his RFP 12 regarding Martin's recruitment, Neighbors "*responded that he had no such documents.*" This statement is, at the same time, both curious and disturbing. Curious because if, as he says, Neighbors had "no such documents," then from which Defendants (or "custodians") did BOE 5281, 5348 (and its attachment, 5349) come from? Those documents are emails back and forth between Neighbors and other BOE members (5281-Terry Frank; 5348-Randy Williams) directly concerning Martin's candidacy, wherein Neighbors, Williams, and Frank offer their opinions about Martin relative to other candidates. *Reply Exh. D.*

Disturbing, because if, as he says, Neighbors has no responsive documents to RFP 12, then in light of the multiple written "litigation hold" notices served on the BOE during and after the administrative process, the question becomes why not? Also, disturbing because,

given the indecipherable state of Defendants' production, as discussed elsewhere herein, it is impossible to tell who actually produced those emails, and who is the "custodian" of same: Neighbors, Frank, or Williams?

### Staffing/AP Govt. Class

At pages 20-21 of their *Response*, Defendants' argue the relevancy of BOE RFPs 30 and 33 regarding staffing patterns at the High School, and staffing of the AP Government class taught by Plaintiff prior to his dismissal. Plaintiff clearly articulated the "threshold and apparent relevancy" of these RPDs in the August 4, 2015 Roth letter (#59-A). Defendant BOE's failure and refusal to reinstate Plaintiff to his teaching position, and his banishment to a satellite position as, essentially, a study hall monitor with little if any teaching duties (Plaintiff is also asked to perform clerical/secretarial functions such as data entry and substitute receptionist) is arguably an "adverse employment action" in and of itself. *McGill v. Board of Ed.*, 602 F. 2d 774, 780 (7th Cir. 1979). This could be evidence of continuing retaliation.

In their *Response*, Defendants somehow feign ignorance as to how Plaintiff's exile from teaching in a classroom is relevant to his damages herein, notwithstanding the fact that Plaintiff previously referred Defendants to Plaintiff's own Interrogatory Response 13 as to how this assignment caused him additional humiliation and anguish.

This ongoing humiliation to Plaintiff is exacerbated by the fact that the District is apparently continuing to certify student AP Govt. grades from that class for college credit to the College Board, while the class is being taught by a teacher who is not certified to teach AP classes[5]. The District apparently has perpetrated this falsehood by certifying, for the last two years up to current date, to the College Board using *Plaintiff's* credentials, falsely representing that *Plaintiff* is still teaching the AP class. Plaintiff has not taught that AP Govt.

---

[5] As Defendants state, any high school teacher can teach an AP class, but only *for high school credit.* They miss the point entirely! Only after a high school teacher takes extra courses and training, and thereby becomes a College Board-approved and certified AP teacher, can that teacher's students' AP grades be approved *for future college credit.*

class since his suspension in April 2013! This deception also bears on Defendant Gouge's credibility, and animus against Plaintiff, if she in fact was aware of, and condoned, this misrepresentation. Defendants should be required to provide responsive materials to BOE RFPs 30 and 33.

Having demonstrated the "threshold and apparent relevancy" of the foregoing subjects, Defendants cannot hope to meet the substantial burden to the contrary.

6. **Plaintiff's Medical Records**

The whole scale insincerity of Defendants' objections to Plaintiff's discovery requests is arguably best evidenced by Defendants' repeated efforts to shift the Court's attention away from their flagrant discovery abuses and onto the quintessential "red herring" of Plaintiff's alleged failure to produce his medical records. Time and time again in their *Response*,[6] Defendants' primary justification for their serial violation of discovery rules is to harp over the "issue" of Plaintiff's production of his medical records, as if that issue has anything to do with Defendants' own culpability herein. Defendants' obsessive focus on Plaintiff's medical records production is a "poster child" for the classic Red Herring fallacy. In the face of their own indefensible intransigence, Defendants try to duck, dodge, deflect, and even deceive, by asking this Court to focus on Plaintiff's "late" records production. This tactic fails for several reasons:

First of all, and fatal to Defendants' Red Herring fallacy, Defense counsel informed Plaintiff's attorneys as far back as May 27, 2015 **that he didn't want Plaintiff to produce medical records that weren't in his possession, but that he was going to subpoena them himself,** thereby rebuffing the undersigned's earlier offer to produce the records.

Defense counsel King's entire email of May 27th:

"Philip:

We appreciate the offer for you to obtain the documents from the providers, but we prefer to issue the subpoenas and get the documents

---
[6] *Response*, pgs. 4-5, fn 2; p. 10, fn 5; Poe's Declaration (#60), ¶¶ 8 – 9.

Page **13** of **16**

Case 1:14-cv-00170-MOC-DLH   Document 64   Filed 09/28/15   Page 13 of 16

directly, as is the normal case with any third party. That way we can communicate directly with the providers, make sure that they have fully complied, move to enforce, etc. Plaintiff still needs to provide the medical records that he has, but we will get a full set of the documents directly from the physicians as well. "[7]

How then can Defendants credibly complain of the pace of records production by Plaintiff in the face of this email telling Plaintiff not to bother?

If Defendants' obsession with the production of Plaintiff's records were sincere, and not just window-dressing to bolster their Red Herring fallacy, why then did they discourage Plaintiff from obtaining his own medical records and then wait **3½ months,** until September 16th – coincidentally, the very day before filing their *Response* – to issue their subpoenas? And this, after already having in hand all of Plaintiff's production of medical records[8] save for one second-opinion record that is forthcoming.

Defendants' hoax aside, Defendants appear to be trying to justify their systematic failure to produce responsive documents on the theory that they are excused from having to produce their discovery until such time as Plaintiff produces his medical records. As a matter of civil procedure, however, one cannot hold one's own discovery hostage because an opponent is failing to produce its discovery. *Land Ocean Logistics, Inc. v. Aqua Gulf Corp.*, 181 F.R.D. 229, 235 (W.D.N.Y. 1998)("Defendants' failure to respond to Plaintiff's Requests does not . . . excuse Plaintiff from complying with Defendants' discovery requests. Plaintiff's withholding

---

[7]Defendants purport to set out a chronology of discovery-related communication between opposing counsel in the Exhibits to their Response, but inexplicably omit this email despite its obvious implications for the accuracy, even credibility, of their medical records argument.

[8] Defendants tell this Court at page 10 of their Response that Plaintiff "claimed (in his Complaint) that he possessed medical records." This isn't true, as paragraph 77 of the Amended Complaint only states that Plaintiff suffered damages "as would be borne out by medical documentation," saying nothing of actually possessing such documentation. Plaintiff himself didn't "possess" that documentation until mid-August, which he promptly produced to Defendants a week later.

Page **14** of **16**

Case 1:14-cv-00170-MOC-DLH   Document 64   Filed 09/28/15   Page 14 of 16

of production of the requested information and documents contingent upon the production of discovery by the opposing party in this case [is] clearly improper.")

Were production of Plaintiff's medical records of true interest to Defendants, the solution was to bring their own Motion to Compel.

### Conclusion

It is clear from the foregoing that Defendants have little regard for the rules of civil procedure and this Court's time. They, together with their counsel, have set upon a course of action calculated to frustrate the discovery process and "run out the clock." This court needs to send Defendants a message and deter similarly-minded litigants from flouting their responsibilities.

Respectfully submitted this 28th day of September 2015.

LAW OFFICE OF DAVID KULA

/s David Kula
N.C. Bar No. 42401
Co-counsel for Plaintiff
P.O. Box 6780
Asheville, North Carolina  28816
(828) 505-7105 telephone
(828) 505-7107 facsimile
david@davidkula.com

MARSHALL, ROTH & GREGORY, PC

/s Philip J. Roth

PHILIP J. ROTH
N.C. Bar No. 22765
Co-Counsel for Plaintiff
Post Office Box 769
Asheville, North Carolina  28802
(828) 281-2100 telephone
(828) 281-2120 facsimile
proth@mrglawfirm.com

CERTIFICATE OF SERVICE

The undersigned hereby certifies that he electronically filed the foregoing Reply in Support of Plaintiff's Motion to Compel with the Clerk of Court using the CM/ECF system. This 28th day of September 2015.

                                               s/ Philip J. Roth
                                               Philip J. Roth