UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
DOCKET NO. 1:14-cv-00170-MOC-DLH

| | | |
|---|---|---|
| **STANLEY JEFFREY PENLEY,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | ORDER |
| | ) | |
| **MCDOWELL COUNTY BOARD OF** | ) | |
| **EDUCATION, ROBERT GILLESPIE, GERRI** | ) | |
| **MARTÍN, H. RUSSELL NEIGHBORS, AND** | ) | |
| **NATALIE GOUGE,** | ) | |
| | ) | |
| Defendants. | ) | |

**THIS MATTER** is before the court on the Motions for Summary Judgment by: 1)

Defendant Robert Gillespie (#79); 2) Defendants McDowell County Board of Education, Natalie

Gouge, and H. Russell Neighbors (#81); and 3) Defendant Gerri Martín (#83), all of which have

been fully briefed and are ripe for review. The court held oral arguments on these Motions on

July 28, 2016. Having considered the Motions, the arguments of counsel, and the applicable law,

the court enters the following findings, conclusions, and Order.

**FINDINGS AND CONCLUSIONS**

I.    FACTUAL BACKGROUND

The facts as alleged in this case, which are not generally disputed by the parties, are as

follows. Plaintiff Stanley Penley was hired by the McDowell County Board of Education to

teach at McDowell County High School beginning in the 2006-2007 school year, obtaining

Career Teacher status (tenure) during the 2010-2011 school year, and working there throughout

each school year until he was suspended with pay on April 22, 2013 by Defendant Natalie

Gouge, Principal of McDowell County High School at the time (hereinafter "Principal Gouge"). In addition to working as a teacher, Plaintiff was a political consultant for Democratic candidates in McDowell County. In that role, he assisted with campaigns of candidates opposing Representative Robert Gillespie (hereinafter "Representative Gillespie") in the 2004, 2006, and 2008 elections. Representative Gillespie was the incumbent North Carolina House of Representatives member for the 85th District until his resignation in 2013. As a part of Plaintiff's work for Democratic campaigns for the North Carolina House of Representatives, Plaintiff assisted in producing several television commercials opposing Representative Gillespie's candidacy, the most recent being in 2008. According to Plaintiff's Amended Complaint, Representative Gillespie was determined to "get Plaintiff" because of Plaintiff's work for Representative Gillespie's political rival, and made overt statements to that effect to Plaintiff. See Amended Complaint (#23) at ¶ 15.

In July of 2012, Defendant Gerri Martín was hired as the Superintendent of the McDowell County Schools (hereinafter "Superintendent Martín"). In or around August of 2012, Superintendent Martín invited Representative Gillespie to tour McDowell County schools. According to the allegations in Plaintiff's Amended Complaint, as Superintendent Martín and Representative Gillespie toured McDowell County High School in or around September of 2012, just as Superintendent Martín was about to enter Plaintiff's classroom, Representative Gillespie "took Martín's arm, pulled her back into the hall, and told Martín: 'that's the one I've been telling you about…'" See Amended Complaint (#23) at ¶ 21.

Some eight months later, on April 17, 2013, Plaintiff made comments of a sexual nature in front of his Advanced Placement Government class. Plaintiff admits to stating, "[t]here is a

-2-

study out there that says that men think about sex every six seconds, unless you happen to be sitting next to your girlfriend, and it might be more like four seconds." <u>See</u> (Pl. Depo. (#81-1) at 33:9-19). Further, Plaintiff admits that he was aware that there was a student couple in the room, who sat next to each other in class, but denies that the comment was directed at the couple. <u>Id.</u> at 42:12-23. When Plaintiff realized the girlfriend's negative reaction to the comment, he immediately apologized to her. <u>Id.</u> at 39:4-12. He also sought her out later in the day to speak with her about the incident again. <u>Id.</u> at 40:3-21. The student, through her mother, ultimately told Principal Gouge about the comment. Plaintiff admits that, if such a comment were directed by a teacher at a particular student, it would be inappropriate. <u>Id.</u> at 44:15-21. He further admits that if a student believed such a comment were directed at him or her, her or she would have legitimate grounds to complain to the principal. <u>Id.</u> at 82:16-83:2. Plaintiff acknowledges that the school administration would then have a duty to investigate the complaint. <u>Id.</u> at 44:18-25, 50:4-8.

After the student filed her complaint, Principal Gouge contacted Mark Garrett, the Assistant Superintendent of McDowell County Schools at that time, who instructed Principal Gouge to begin an investigation into the allegations. The following day, April 18, 2013, Principal Gouge was informed of a Facebook exchange between Plaintiff and one of his male students. This exchange concerned the male student's posting of a photo in which he was wearing a bathing suit and no shirt. Plaintiff commented on the photo, resulting in a public posting, accusing the student of joining an organization called North American Man-Boy Love Association, which promotes the legalization of pedophilia (NAMBLA) and of "playing for the other team." (Pl. Depo. at 217:13-19). Plaintiff stated at his deposition he made the comments to discourage the student from posting inappropriate photos in language that he thought would "get

through" to the 18-year-old student. Id. at 285:12-20. Over the next several days, Principal Gouge interviewed students and Plaintiff to further investigate the issues surrounding the comment made during class.

Ultimately, Principal Gouge drafted a letter of reprimand (LOR) to Plaintiff regarding the two incidents. On April 22, 2013, Principal Gouge contacted Superintendent Martín to inform her of the situation. Superintendent Martín determined further investigation was necessary and instructed Principal Gouge to suspend Plaintiff with pay. Following Plaintiff's suspension with pay, Principal Gouge, Rodney Wheeler (assistant principal at the time), and Kent Brown (the school board attorney) interviewed each student in Plaintiff's AP Government class about the "six seconds/four seconds" comment. The interviews reflected statements that both corroborated and somewhat contradicted the girlfriend's alleged story. Upon completion of the student interviews, Principal Gouge met again with Plaintiff and his union representative on April 25, 2013 to discuss the "six seconds/four seconds" comment.

On August 21, 2013, Superintendent Martín notified Plaintiff after a stay of the suspension that she was recommending his termination. Pursuant to state statutory procedures for career teachers, Plaintiff requested a hearing before a hearing officer. In September 2013, Superintendent Martín resigned from her position to assume a superintendent position in another school district. On October 22, 2013, Mark Garrett, the interim Superintendent at the time, executed and served Plaintiff's Notice of Intent to Recommend Dismissal. Plaintiff went before a hearing officer on October 29, 30, and 31, 2013 regarding the recommended dismissal, at which he was represented by counsel. On December 10, 2013, the hearing officer issued a decision that that the evidence against Plaintiff did not warrant termination, and finding that none of the

charges set forth in the Notice of Intent to Recommend Dismissal were supported by the facts (under a preponderance of the evidence standard) and that they were, in fact, contradicted by credible witness testimony. See (#83-6) at p. 43-57. Mr. Garrett decided not to pursue the dismissal further and reinstated Plaintiff to a teaching positon at the Early College in McDowell College, where Plaintiff remains employed.

## II.    PLAINTIFF'S ALLEGATIONS

Plaintiff alleges that the discipline he received in 2013 was not in response to complaints from students, but was retaliation for his political activities, including his creation of "attack ads" against Republican political candidates in McDowell County, particularly Representative Gillespie. Plaintiff makes specific conspiracy allegations as to the Defendants in this lawsuit: first, that Representative Gillespie was "out to get" Plaintiff due to Plaintiff's Democratically affiliated activities in 2004 through 2008; Representative Gillespie enlisted the help of H. Russell Neighbors, a member of the Board of Education ("BOE") (hereinafter "BOE Member Neighbors") to "get" Plaintiff; BOE Member Neighbors then pressured Superintendent Martín to join; Superintendent Martín then pressured Principal Gouge to join; and Principal Gouge then coerced students into giving false statements about Plaintiff's behavior.

Plaintiff has asserted a 42 U.S.C. § 1983 claim as to Defendants Neighbors, Martín, and Gouge in their individual capacities; Gillespie; and the McDowell County BOE, alleging violation of his First Amendment rights (Count One). Additionally, Plaintiff seeks relief from Defendants Gillespie, Neighbors, Martín, and Gouge in their individual capacities for civil conspiracy (Count Two). Alternatively, Plaintiff alleges his third claim for relief under the North Carolina Constitution (Count Three). Plaintiff also asserts a claim for intentional infliction of

emotional distress against Defendants Martín, Neighbors, and Gillespie (Count Four). Plaintiff's

fifth claim for relief is against Representative Gillespie for tortious interference with contract

(Count Five). Plaintiff's final claim for relief is against Superintendent Martín for malicious

prosecution (Count Six). Collectively, Defendants have filed Motions for Summary Judgment on

all claims asserted against them.

### III.   OVERVIEW OF PLAINTIFF'S ALLEGED CONSPIRACY RELATIONSHIPS

According to Plaintiff, the purpose of the conspiracy, and the motivations of each

participant, were to punish Plaintiff for his political activities. As such, the conspiracy claims

stem from Representative Gillespie's alleged animus towards Plaintiff, as described above, and

his influence on others within the community.

#### 1.   Gillespie-to-Neighbors-to-Martín-to-Gouge

##### i.   *Relationship between Gillespie and Neighbors*

Plaintiff argues that Representative Gillespie enlisted his friend and former business

partner, BOE Member Neighbors, to join the conspiracy. Plaintiff asserts that BOE Member

Neighbors agreed with Representative Gillespie to use his position and influence on the BOE to

"get rid" of Plaintiff specifically for the purpose of retaliating against Plaintiff for his political

opposition to Representative Gillespie. The evidence shows that the connection between

Defendants Gillespie and Neighbors derives from shared ownership of a piece of property, see

Neighbors Depo. (#81-12 at 14:3-9), and from Representative Gillespie's $1,000 donation to

BOE Member Neighbors' school board campaign. Id. at 17:5-11. However, BOE Member

Neighbors stated at his deposition that he had not had business dealings with Representative

Gillespie in over a decade, had not spoken to him in years, and that he had never heard of

Plaintiff until after he was suspended by Defendant Martín. Id. at Dep. 16:9-13; 88:19-22; 31:3-5. When asked at his deposition whether he had any evidence that BOE Member Neighbors joined a conspiracy to punish Plaintiff for his political activities, Plaintiff admitted he had no direct evidence. See (Pl. Depo. (#81-1) at 317:11-24).

### ii. Relationship between Neighbors and Martín

Plaintiff next contends that BOE Member Neighbors enlisted Superintendent Martín to use her position as Superintendent to help him and Representative Gillespie get rid of Plaintiff because of his political activities. BOE Member Neighbors, via his position as Board Chair, was supposedly able to persuade Superintendent Martín by supporting her employment, offering her a favorable rent arrangement, and utilizing his close relationship with Representative Gillespie. See Amended Complaint (#23) at ¶31-32.

### iii. Relationship between Martín and Gouge

The final link in the alleged conspiracy chain supposedly occurs when Superintendent Martín implemented her agreement with Defendants Gillespie and Neighbors to terminate Plaintiff in retaliation for his political activities, and pressured Principal Gouge to conduct a sham investigation of Plaintiff regarding complaints from students. Plaintiff asserts that Defendant Martín was able to pressure Principal Gouge into conducting said sham investigation through pressure from her supervisor (Defendant Martín), and the BOE Board Chair and longtime friend BOE Member Neighbors. See Amended Complaint (#23) at ¶42.

### 2. Gillespie-to-Martín-to-Gouge

In Plaintiff's "Response to Board of Education, Neighbors, and Gouge," (#90) Plaintiff argues an alternative conspiracy chain suggesting that perhaps co-conspirator Superintendent

Martín was the link between the animus and the action based on Representative Gillespie's direct, personal solicitation of Martín during his campus visit in 2012. This conspiracy chain theory eliminates the link of BOE Member Neighbors, but Plaintiff failed to amend his pleadings to reflect this argument. As with all litigation, this case has been structured around the facts alleged and requests for relief asserted in the Amended Complaint, which put the opposing party on notice of the legal claims being asserted against it. See FED. R. CIV. P. 8. The court will therefore not consider this newly espoused alternative theory of conspiracy.

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id. The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). Once this initial burden is met, the burden shifts to the nonmoving party. That party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Instead, that party must present sufficient evidence from which "a reasonable jury could return a

verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 252.

## V.    DISCUSSION

### 1.    Deprivation of First Amendment Rights (Count One)

Plaintiff first asserts a §1983 claim, contending that Defendants violated his First Amendment rights. He argues that his support of Representative Gillespie's political opponent was "protected activity" under the First Amendment, and that said activity was a direct cause of the adverse employment actions taken against him by Defendant Martín (acting in concert with the other Defendants) through her decision to suspend Plaintiff from his teaching position and seek his dismissal as a career teacher.

The First Amendment to the United States Constitution, in relevant part, provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. The Fourteenth Amendment makes this prohibition applicable to the states. See Fisher v. King, 232 F.3d 391, 396 (4th Cir. 2000). First Amendment protections extend to "the right to be free from retaliation by a public official for the exercise of that right." Suarez Corp. Indus. v. McGraw, 202

F.3d 676, 685 (4th Cir. 2000). "The government may not retaliate against a public employee who exercises her First Amendment right to speak out on a matter of public concern. This means, for example, that [a] state may not dismiss a public school teacher because of the teacher's exercise of speech protected by the First Amendment." Love-Lane v. Martín, 355 F.3d 766, 776 (4th Cir. 2004) (internal citations and quotation marks omitted).

A public employee must establish several elements to state a claim for deprivation of First Amendment rights flowing from an adverse employment action: (1) the employee spoke as (i) a citizen on a (ii) matter of public concern; (2) the employee's and public's interests in the First Amendment expression outweighs the employer's legitimate interest in the efficient operation of the workplace, if that interest was infringed by the communication[1], and (3) the protected speech is a substantial factor in the decision to take adverse employment action. Smith v. Gilchrist, 749 F.3d 302, 308 (4th Cir. 2014). The first two elements are questions of law; the third element of causation may be decided on "summary judgment only in those instances when there are no causal facts in dispute." Love-Lane, 355 F.3d at 776.

The court here finds that even assuming Plaintiff had shown the first two factors,

---

[1] The second factor, which is known as the Pickering balancing test as articulated in Pickering v. Board of Education, 391 U.S. 563 (1968), "involves a two-step inquiry: initially, a court must determine whether the speech that led to an employee's discipline regarded a matter of public concern; and second, if it does, free speech concerns are balanced against efficient public service concerns." Liverman v. City of Petersburg, 106 F. Supp. 3d 744, 756 (E.D. Va. 2015). As the Fourth Circuit has noted, while "[p]rotection of the public interest in having debate on matters of public importance is at the heart of the First Amendment…the government, as an employer, is entitled to maintain discipline and ensure harmony as necessary to the operation and mission of its agencies. And for this purpose, the government has an interest in regulating the speech of its employees." Smith v. Gilchrist, 749 F.3d 302, 308 (4th Cir. 2014) (internal citations and quotation marks omitted). When such interests conflict with the free speech rights of public employees, courts must "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Lawson v. Union Cty. Clerk of Court, No. 14-2360, --F.3d--, 2016 WL 3662101, at *8 (4th Cir. July 7, 2016) (quoting Pickering v. Board of Education, 391 U.S. 563, 568 (1968)). Because the court finds that Plaintiff's claim fails on the third element of causation, it declines to substantively analyze the facts of this case under the second factor.

Plaintiff's claim fails on the causation element. As to causation, a plaintiff must show that 'but for' the protected expression, the employer would not have taken the alleged retaliatory conduct. Huang v. Bd. of Cov'rs, 902 F.2d 1134, 1140 (4th Cir. 1990). The causation inquiry involves a two-step test. First, the employee must establish the requisite causation to prove that the protected speech was a motivating factor or played a substantial role in inducing the adverse action. See Peters v. Jenney, 327 F.3d 307, 323 (4th Cir. 2003) (quotations, citation, and alterations omitted). If the employee is able to prove as much, the second step shifts the burden to the employer to put forward evidence that it would have taken the adverse action even in the absence of the protected speech at issue. Id. The Supreme Court has stated that "if there is a finding that retaliation was not the but-for cause of the discharge, the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind." Hartman v. Moore, 547 U.S. 250, 260 (2006) (citations omitted). This inquiry arises from the Supreme Court's recognition that a "rule of causation which focuses solely on whether protected conduct played a part" in an adverse employment decision "could place an employee in a better positon as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing." Mt. Healthy City Sch. Dist. v. Doyle, 429 U.S. 274, 287 (1977).

Causation may be established through temporal proximity, and the opposite is equally true. See, e.g., Dowe v. Total Action Against Poverty, 145 F.3d 635, 657 (4th Cir. 1998) ("A lengthy time lapse between the [public official's] becoming aware of the protected activity and the alleged adverse ... action ... negates any inference that a causal connection exists between the two.") (finding no causation when three years elapsed between activity and alleged adverse

action); <u>Jensen v. W. Carolina Univ.</u>, No. 2:11CV33, 2012 WL 6728360, at *21 (W.D.N.C. Dec. 28, 2012), <u>aff'd,</u> 538 F. App'x 359 (4th Cir. 2013) (per curiam) (unpublished) (finding 11 month time lapse was too distant to support finding of causation).

Applying such standards to the facts of this case, the court finds that the temporal relationship between the protected activity and the alleged retaliation do not support Plaintiff's case. Plaintiff alleges that the adverse action consisted of the retaliatory investigation in response to Plaintiff's political activities, and the ultimate recommendation that Plaintiff be terminated from his position as career teacher. However, the court finds that Plaintiff's political activities in 2004, 2006, and 2008 are too distant from the discipline he received in 2013 for causation to be established through temporal proximity. Plaintiff has not produced additional evidence of causation compelling enough to overcome the large time gap in order to demonstrate that his political activities were a substantial factor in any adverse action.

Plaintiff faces additional challenges in showing "but for" causation, as Defendants have presented evidence showing that the investigation and some discipline were warranted given the circumstances. Plaintiff admits to making the "six seconds/four seconds" comment in class. (Plaintiff Dep. 33:9-19). He admits that the student (girlfriend) genuinely believed the comment was directed at her and that it embarrassed her. (<u>Id.</u> at 42:12-23). Plaintiff admits that if such a comment were made towards a student, it would be inappropriate. (<u>Id.</u> at 44:15-21). Plaintiff admits tracking down the girlfriend after class, and attempting to persuade her not to complain about his conduct. (<u>Id.</u> at 40:18-21, 48:2-15). Plaintiff also admits to engaging in the Facebook dialogue with another student stating that the student had joined NAMBLA and is "playing for the other team." (<u>Id.</u> at 217:13-19). Plaintiff admits that accusing a student of being in a

pedophilic relationship is inappropriate, regardless of the reason or context. (Id. at 15:6-11). Thus, Plaintiff's own testimony establishes a legitimate, non-discriminatory basis for administrators to investigate and discipline him. Plaintiff cannot show that but for his political activities, the school officials would not have undergone the investigation.

The court has also considered whether there is any evidence to support a finding that Defendant Martín's investigation and recommendations regarding Plaintiff's employment were some sort of pretext for political retaliation. Superintendent Martín has stated by declaration that she was unaware of Plaintiff's political activities as of April 21, 2013. See Martín Decl. at ¶ 8 (#83-6 at p. 60). She also stated that his political activities played no role in her decision to investigate, suspend, and recommended dismissal of Plaintiff. Id. at ¶ 9. While Plaintiff appears to argue that an inadequate investigation as to complaints against him equate to a retaliatory motive, such argument simply is not supported by the record. Plaintiff was given a hearing as provided by state law. He had multiple opportunities to respond to the allegations against him and reminded of his opportunities to respond. Plaintiff was represented by counsel during this time. Plaintiff ultimately prevailed at the hearing and remains employed with the McDowell County school system. The Hearing Officer's Report itself states in part, "[w]hile [Plaintiff] argued that his recommended dismissal is related to the actions of Representative Gillespie wanting him fired for political reasons, I am unable to make that finding based on the evidence." (Doc. 83-6, 47). Plaintiff attempts to use the Hearing Officer's Report as evidence of retaliatory motive, despite the fact that the Hearing Officer expressly declined to make such finding.

Here, the court finds that even assuming Plaintiff had brought forth enough evidence to show that his political activity was a motivating factor or played a substantial role in the

investigation about his alleged misconduct, Defendants have put forward evidence that it would have taken such action even in the absence of the protected speech at issue. See Peters v. Jenney, 327 F.3d 307, 323 (4th Cir. 2003). Plaintiff has failed to refute evidence "that the decision to terminate the plaintiff would have been made even in the absence of the protected expression," Wagner v. Wheeler, 13 F.3d 86, 90-91 (4th Cir. 1993), and has not presented evidence beyond mere speculation that would allow a reasonable fact finder to conclude that his political activity caused such discipline. Rather, the evidence demonstrates that the administration acted good faith in responding to the student complaints, and that the administration had legitimate cause for investigating Plaintiff's conduct. As such, Plaintiff cannot succeed on a §1983 claim for a First Amendment violation, and the court will therefore grant summary judgment to Defendants on that count.[2]

### 3. Civil Conspiracy (Count II)

Plaintiff has alleged the existence of a civil conspiracy by Defendants, formed in order to retaliate against Plaintiff for exercising his First Amendment rights. "A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict the harm or injury upon another and an overt act that results in damages." Hafner v. Brown, 983 F.2d 570, 577 (4th Cir. 1993). To establish a civil conspiracy under § 1983, Plaintiff must present evidence that the accused Defendants "acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [Plaintiff's] deprivation of a constitutional right." Hinkle v. City of Clarksburg, W.Va., 81 F.3d 416, 421 (4th

---

[2] Because the court finds that Plaintiff's First Amendment claim fails on the merits, it will not address the defenses asserted as to this claim.

Cir. 1996) (citing <u>Hafner</u>, 983 F.2d at 577). While Plaintiff need not produce direct evidence of a meeting of the minds to establish a civil rights conspiracy, he must produce "specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective." <u>Id.</u> This is a weighty burden and must amount to more than conjecture. <u>Id.</u> at 422.

As applicable in this case, where the court has already determined that the alleged constitutional violation may not proceed, dismissal of the conspiracy claim is appropriate. <u>See id.</u>; <u>Washington v. Buraker</u>, 322 F. Supp. 2d 702, 715 (W.D. Va. 2004), <u>aff'd sub nom.</u> <u>Washington v. Wilmore</u>, 407 F.3d 274 (4th Cir. 2005). Because the court finds that Plaintiff cannot succeed on his First Amendment claim, he cannot show that any number of people "acted jointly… [and caused]…[a] deprivation of a constitutional right." <u>Hinkle</u>, 81 F.3d at 421. Summary judgment for Plaintiff's conspiracy claim is appropriate on that basis alone.

The court also finds that the conspiracy claim would fail on the merits even if Plaintiff's First Amendment claim could proceed past summary judgment because Plaintiff has failed to come forward with any evidence, either circumstantial or direct, that would allow a jury to find the existence of a conspiracy. As noted above, the chain of conspiracy claimed by Plaintiff is Gillespie-to-Neighbors-to-Martín-to-Gouge. Under Plaintiff's conspiracy theory, Representative Gillespie held the animus (a desire to see Plaintiff punished for his political activities) and Defendants Gouge and Martín took the actual action (an investigation and, as to Martín, suspension and recommendation of dismissal). The link between the animus and the action, according to Plaintiff, was BOE Member Neighbors. However, BOE Member Neighbors stated in his deposition that he had never heard of Plaintiff until after he was suspended by Dr. Martín.

<u>See</u> Neighbors Depo. (#81-12) at 31:3-5. Plaintiff has come forth with no evidence to call such statements into question. Additionally, as noted above, when asked at his deposition whether he had any evidence that BOE Member Neighbors joined a conspiracy to punish Plaintiff for his political activities, Plaintiff admitted he had no direct evidence, only the circumstances of his relationship with Representative Gillespie and some statements made to him by other board members. <u>See</u> (Pl. Depo. (#81-1) at 317:11-24). Plaintiff has also admitted that he has no evidence Principal Gouge was part of the conspiracy or that she was motivated to punish Plaintiff for his political activities, only the circumstantial evidence of her "buil[ding] a case of lies" against him. (Pl. Depo. at 314:15-315:3, 194:17-20, 234:2-9). Plaintiff further lacks evidence that the BOE did anything as an entity to punish Plaintiff. (Pl. Depo. at 175:15-17, 493:6-12). Thus, Plaintiff's claims are supported only by suspicions and conjecture, not evidence from which a jury could reasonably find the existence of a conspiracy.

Not every instance of alleged mistreatment by an employer amounts to a violation of law. Here, Plaintiff has failed to "come forward[] with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective." <u>Hinkle v. City of Clarksburg</u>, 81 F.3d 416, 421 (4th Cir. 1996). He has not presented evidence that would reasonably lead to the inference that the defendants came to a mutual understanding to try to "accomplish a common and unlawful plan," but only set forth arguments that amount to "rank speculation and conjecture." <u>Id.</u> at 421-22. Because Plaintiff has not met his burden on the conspiracy claim, summary judgment is appropriate. <u>See</u> <u>Reinhold v. Tisdale</u>, No. 8:06-3311-MBS, 2008 WL 2952354, at *4 (D.S.C. July 28, 2008) ("Here, the plaintiff has presented nothing other than his own speculation that there was a conspiracy. Thus, this claim must fail.").

### 4. North Carolina Constitutional Violation (Count III)

Plaintiff asserts violations of the North Carolina constitution in the alternative. "Under North Carolina law, a plaintiff may bring a direct claim under the state constitution if no other adequate remedy exists." Sheaffer v. Cty. of Chatham, 337 F. Supp. 2d 709, 729 (M.D.N.C. 2004) (citing Corum v. University of N.C., 413 S.E.2d 276, 289 (N.C. 1992)). Under Article I, §§ 12 and 14 of the North Carolina Constitution, an employee of a state governmental subdivision such as Plaintiff has the right to freely associate and engage in political activities without being harassed, intimidated, or retaliated against by his employer for the exercise of those rights. See N.C. Const. art. 1, § 12 ("The people have a right to assemble together for their common good…"); N.C. Const. art. 1, § 14 ("Freedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained…"). "The standards for free speech retaliation claims under the state constitution are the same as those for free speech claims under the federal constitution." Sheaffer, 337 F. Supp. 2d at 729 (collecting cases). See also Munn-Goins v. Bd. of Trustees of Bladen Cmty. Coll., 658 F. Supp. 2d 713, 730 (E.D.N.C. 2009), aff'd, 393 F. App'x 74 (4th Cir. 2010) ("The standards for free-speech claims under the North Carolina Constitution are substantially identical to those for free-speech claims under the federal constitution."). As applicable in this case, the North Carolina Constitutional claim requires Plaintiff to come forward with specific evidence that the "protected speech or activity [must have been] the motivating or but for cause." Evans v. Cowan, 132 N.C. App. 1, 9, 510 S.E.2d 170, 175 (1999) (citations and quotation marks omitted). For the same reasons stated above as to why Plaintiff's First Amendment claim cannot proceed, the court finds that Plaintiff's claims under the North Carolina Constitution cannot proceed. Accordingly, the court

will grant summary judgment to Defendants on this count.

### 5. Intentional Infliction of Emotional Distress (Count IV)

Plaintiff has also asserted a tort claim for intentional infliction of emotional distress ("IIED") as to Defendants Martín, Neighbors, and Gillespie in their individual capacities. Defendants do not brief the issue substantively, but rely solely on the defense of public official immunity. Plaintiff failed to brief the issue and did not address the claim at oral argument. Such omissions indicate that Plaintiff has abandoned this claim, or that dismissal based upon such procedural failures would be appropriate. See Cathey v. Wake Forest Univ. Baptist Med. Ctr., 90 F. Supp. 3d 493, 509 (M.D.N.C. 2015) (dismissing claim without prejudice where the only relevant argument on summary judgment was in a footnote and finding, "[o]n this record, there is simply not sufficient argument, factual or legal, to provide the court any guidance as to the substance of the contention."). However, the court finds that even if Plaintiff wished to pursue this claim, it would fail on the merits due to the complete lack of evidence in support thereof.

Liability for IIED in North Carolina arises when a defendant's conduct exceeds all bounds usually tolerated by decent society, causing serious mental distress. Stanback v. Stanback, 254 S.E.2d 611, 622 (N.C. 1979). Intentional infliction of mental distress consists of: (1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress to another. Dickens v. Puryear, 276 S.E.2d 325, 335 (N.C. 1981). "The determination whether conduct rises to the level of extreme and outrageous behavior is a question of law." Rouse v. Duke Univ., 869 F. Supp. 2d 674, 681 (M.D.N.C. 2012) (quoting Foster v. Crandell, 638 S.E.2d 526, 537 (N.C. Ct. App. 2007)). Extreme and outrageous conduct must "go beyond all possible bounds of decency, and ... be regarded as atrocious, and utterly

intolerable in a civilized community." Id. (citation omitted). "North Carolina courts have set a high threshold for a finding that conduct meets the standard." Id. (collecting cases). See also Hensley v. Suttles, No. 1:14-CV-00193-MR-DLH, 2016 WL 951649, at *10 (W.D.N.C. Mar. 9, 2016) (collecting cases and discussing "the [types of] atrocious and utterly intolerable acts necessary to satisfy the 'extreme and outrageous' conduct element of an IIED claim.").

In the context of an IIED claim, "severe emotional distress" is defined to mean "any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." Johnson v. Ruark Obstetrics, 395 S.E.2d 85, 97 (N.C. 1990). To satisfy this element, a plaintiff must forecast medical documentation or "evidence of 'severe and disabling' psychological problems within the meaning of the test laid down in Johnson," Strickland v. Jewell, 562 F. Supp. 2d 661, 676 (M.D.N.C. 2007), which "presents a high standard of proof for plaintiffs." Id. (citation and internal quotation marks omitted).  Courts should consider "[t]he intensity and duration of the distress" in assessing the alleged distress, but remain mindful of the fact that "[t]he law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." Id. (citations and internal quotation marks omitted).

Plaintiff asserted in his Amended Complaint that beginning in April 2013 and continuing to the present, Defendants' actions caused him to suffer severe and extreme emotional distress, resulting in both an emotional/mental disorder and a severe and disabling emotional/medical condition which necessitated numerous medical treatments and hospitalizations. See Amended Complaint (#23) at ¶ 74. However, the uncontradicted evidence shows an opinion prepared by

Moira Artigues, M.D., who reviewed Plaintiff's medical records and concluded that Plaintiff's "psychogenic abdominal and gastrointestinal issues," as well as any other psychiatric issues, were not caused by the actions of Defendants. See (#81-16) at p. 2-4. Dr. Artigues opined that the medical records indicated that Plaintiff's alleged health problems began years before the discipline at issue, and in fact worsened after his reinstatement to his teaching position. Id. The medical report depicted Plaintiff's symptoms as long standing, preceding the actions of the Defendants by many years, even decades. Id. The court also notes that general reports of stress, weight loss, abdominal pain, and nausea, even if they occurred as a result of the actions complained of in this lawsuit are not "so severe that no reasonable man could be expected to endure [them]." See Strickland, 562 F. Supp. 2d at 676–77. Accordingly, the medical evidence does not support a claim for intentional infliction of emotional distress. See id.

Here, the court finds that granting summary judgment as to the intentional infliction of emotional distress claim is appropriate based on the fact that Plaintiff has failed to make any relevant argument, provide medical evidence of sufficiently severe emotional distress, or otherwise provide any evidence to the court that would allow for a finding that the conduct alleged here is "utterly intolerable in a civilized society." The court will therefore dismiss Count IV.[3]

### 6. Tortious Interference with Contract (Count V)

Plaintiff contends in his Amended Complaint that Representative Gillespie tortiously interfered with his employment contract. See Amended Complaint (#23) at ¶ 79-84. Defendant Gillespie does not address this claim in his brief and Plaintiff does not address it in his. No party

---

[3] Because the court finds that Plaintiff's intentional infliction of emotional distress claim fails on the merits, it will not address the defenses asserted as to this claim.

addressed it at oral argument. Again, the court finds that that this claim could be appropriately dismissed based on the lack of argument and supporting legal authority; it is not the role of the court to make the parties' arguments for them. See Cathey v. Wake Forest Univ. Baptist Med. Ctr., 90 F. Supp. 3d 493, 509 (M.D.N.C. 2015); Hughes v. B/E Aerospace, Inc., No. 1:12–cv–717, 2014 WL 906220, at *1 n. 1 (M.D.N.C. Mar. 7, 2014) ("A party should not expect a court to do the work that it elected not to do."). Nonetheless, the court has considered the law as applied to the facts of this case and finds that Plaintiff has failed to meet his burden at summary judgment.

In order to establish a claim for tortious interference with a contract under North Carolina law, Plaintiff must show:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

Champion Pro Consulting Grp., Inc. v. Impact Sports Football, LLC, 976 F. Supp. 2d 706, 716 (M.D.N.C. 2013) (quoting United Labs., Inc. v. Kuykendall, 370 S.E.2d 375, 387 (N.C. 1988)). Here, even assuming that Plaintiff had set forth any argument on this claim, it apparently fails on the third, fourth, and fifth prongs, as no evidence beyond speculation has been presented demonstrating that Representative Gillespie intentionally induced any other Defendant or party to breach the employment contract between Plaintiff and Defendant BOE. Because Plaintiff cannot succeed on this claim, the court will grant summary judgment to Defendants.

### 7. Malicious Prosecution (Count VI)

Finally, Plaintiff asserts that in prosecuting a dismissal action against Plaintiff,

Superintendent Martín acted maliciously and without probable cause. "To recover for malicious prosecution, the plaintiff bears the burden of proving that the defendant: (1) instituted, procured or participated in the [] proceeding against plaintiff; (2) without probable cause; (3) with malice; and (4) the prior proceeding terminated in favor of plaintiff." <u>Mathis v. Dowling</u>, 749 S.E.2d 284, 287 (N.C. Ct. App. 2013) (citation omitted). Here, it is undisputed that the investigation and hearing took place, and that the hearing ended in Plaintiff's favor. The court will therefore only address the second two factors.

As to the second factor, "[p]robable cause exists where there is a reasonable ground for suspicion, supported by facts and circumstances, sufficient to induce a reasonable man to commence a prosecution." <u>Mathis</u>, 749 S.E.2d at 288. Probable cause does not require a showing that "the person bringing the action knows the facts necessary to insure a conviction," but only "sufficient grounds to suspect that the person [charged] was guilty of the offense." <u>Id.</u> Plaintiff argues that however justified Superintendent Martín may have been in initially ordering an investigation into the allegations regarding the "six seconds/four seconds" comment in April 2013, the legitimacy of that action disappeared by the time she suspended Plaintiff without pay and issued her Dismissal Notice four months later. Plaintiff contends that any reasonable superintendent would have known that no "prosecution" was warranted, as indicated by the fact that Principal Gouge concluded within two days of the initial complaint that Plaintiff's alleged conduct warranted nothing more than a letter of reprimand. Superintendent Martín argues that in reaching her determination to suspend and recommend the dismissal, she relied on the advice of the School Board attorney. <u>See</u> Martín Decl. (#83-6) at ¶ 5. She also notes that former North Carolina superintendents Dr. Burns and Dr. Hartness have submitted declarations opining that

Defendant Martín's actions were reasonably justified. See Burns Decl. at ¶ 6-16 (#83-7 at p. 66-68); Hartness Decl. at ¶ 5-16 (#83-7 at p. 75-78). Dr. Burns and Dr. Hartness, both having over fifteen years of experience as professional educators, principals, and superintendents in North Carolina, opined that Superintendent Martín acted reasonably in light of the circumstances. Id. Having carefully considered the matter, the court finds that Plaintiff has produced insufficient evidence of a lack of probable cause to support a finding of malicious prosecution.

Moreover, the court finds that even if Plaintiff had raised a genuine issue of material fact as to probable cause, he cannot succeed on his malicious prosecution claim because he cannot show malice. Regarding the third factor, "[m]alice in a malicious prosecution claim may be shown by offering evidence that [a] defendant was motivated by personal spite and a desire for revenge or that [a] defendant acted with reckless and wanton disregard for plaintiffs' rights." Kirschbaum v. McLaurin Parking Co., 656 S.E.2d 683, 688 (N.C. Ct. App. 2008). Plaintiff asserts that Superintendent Martín acted with malice by failing to investigate the other charges brought against Plaintiff (included charges levied against Plaintiff by students during the investigation of the "six-seconds/four-seconds" comment and the use of vulgar language in class) and by fabricating policies to charge Plaintiff with violating. The court cannot find that such actions amount to a "wanton disregard" of his rights, merely a disagreement with the strategies of the investigation. Plaintiff has failed to offer any evidence of personal spite, desire for revenge, or disregard for his rights that would allow a fact finder to conclude that Superintendent Martín acted with malice. Because Plaintiff has failed to establish a genuine issue of material fact as to malice and lack of probable cause, summary judgment is appropriate on Plaintiff's claim for malicious prosecution.

### VI.  CONCLUSION

For the reasons explained herein, the court finds that none of Plaintiff's claims may proceed past summary judgment. Because even in the light most favorable to Plaintiff, the totality of the evidence presented indicates that there is no genuine factual issue for trial and that no rational jury could find for Plaintiff, Defendants are entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Sylvia Dev. Corp. v. Calvert Cty., Md., 48 F.3d 810, 817 (4th Cir. 1995). The court therefore enters the following Order.

### ORDER

**IT IS, THEREFORE, ORDERED** that the Motions for Summary Judgment by Defendants (##79, 81, 83) are **GRANTED**, and this action is **DISMISSED**.

Signed: August 19, 2016

Max O. Cogburn Jr.
United States District Judge